UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREAT LAKES GEOPHYSICAL, LLLP,

                Plaintiff,

v.                                                  Case Number 13-10830
                                                    Honorable Thomas L. Ludington

TRAVELERS PROPERTY CASUALTY CO.,

                Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S**
**MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The issue in this insurance case is whether the proof of loss that the insured submitted to the insurer was "satisfactory." Because this is a question of fact that must be resolved by a jury and not a court, neither party is entitled to summary judgment on the issue.

I

Plaintiff Great Lakes Geophysical, LLLP, is in the oil and gas exploration business. Defendant Travelers Property Casualty Company is in the personal and commercial insurance business.

A

In 2011, Defendant sold Plaintiff an insurance policy. It provided property insurance coverage from November 26, 2011 through November 26, 2012. Company vehicles, seismic cables, and other equipment were among the covered items.

1

The policy lists four parties as named insureds: Geostar Corp.; West Virginia Development, Inc.; Great Lakes Geophysical, Inc.; and Plaintiff.

Somewhat strangely, two of these entities (Geostar Corp. and West Virginia Development, Inc.) were defunct corporations when the policy was obtained.  And a third (Great Lakes Geophysical, Inc.) had its corporate existence terminated about half way through the policy's term.  (Thus, only Plaintiff was a going concern at the time the claim arose.)

2

The policy establishes the procedures that, in the event of a loss, the insured must follow to recover.  The insured must, for example, promptly notify the insurer, submit a sworn proof of loss, and cooperate in the insurer's investigation.  The express terms of the policy specify:

> You must see that the following are done in the event of loss or damage to Covered Property:
>
> 1.    Notify the police if a law may have been broken.
>
> 2.    Give us prompt notice of the loss or damage.  Include a description of the property involved.
>
> 3.    As soon as possible, give us a description of how, when and where the loss or damage occurred.
>
> 4.    Take all reasonable steps to protect the Covered Property from further damage . . . .
>
> 5.    You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.
>
> 6.    As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.
>
> 7.    We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records.  In the event of an examination, an insured's answers must be signed.

-2-

      8.      Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

The policy also establishes the insurer's obligations if a loss occurs. For example, within 30 days of receipt of the proof of loss the insurer must "give notice of [its] intentions." The policy elaborates:

      1.      We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

      2.      We will not pay you more than your financial interest in the Covered Property.

      3.      We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. . . .

      4.      We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

      5.      We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

          a.      We have reached agreement with you on the amount of the loss; or

          b.      An appraisal award has been made.

3

The policy also contains a number of exclusions from coverage. One of them is an exclusion for losses caused by "[d]ishonest or criminal acts" by a named insured or its "partners, directors, trustees or officers."

B

Sometime around November 1, 2012 (precisely when is unknown), a work truck and a number of seismic cables and boxes were stolen from Plaintiff's Adrian, Michigan facility.

1

Plaintiff learned of the theft on November 3, 2012 and contacted the police.  In the police report, Plaintiff estimated that about 150 cables had been taken.  The total loss, Plaintiff estimated, could be as much as $1,459,000.

The foreman of Plaintiff's Adrian facility, Kevin Mietz, also told the police that he suspected "the person who stole the items is a recently terminated employee or current employee."  He explained that the thief had known what to take — he or she had left the older cables and "the only cable stolen from inside the building were the good cables."  He also told police that one of Plaintiff's former employees, Mitchell Kapinski, was rumored to have started his own competing business.

**2**

Five days later, the police recovered the stolen truck at the edge of a lake in Somerset, Michigan (about 20 miles from the Adrian facility).  The police report discloses: "The vehicle looked to have been driven or pushed over a hill and came to rest at the water's edge.  There were no cables in the back of the truck or recovered elsewhere.  The vehicle['s] tires were caked with mud and the marshy area around them were entrenched.  It was obvious someone tried to drive the vehicle into the water or back up the hill.  Given the circumstances, the water was the likely destination."

3

To date, the seismic cables and most of the equipment have not been recovered.  Nor have any arrests been made.

C

Plaintiff first notified Defendant of the loss on November 5.  Describing the loss, the notice explained: "Insured discovered truck missing from premises, truck was loaded with over $1,000,000 of equipment."

1

Two days later, one of Defendant's claim adjusters, Tracy Beaudoin, emailed Plaintiff requesting eight categories of information (labeled 1–9, but missing number 5).  She wrote:

> I have attached a Proof of Loss Form "POL" that you will need to complete and return to me with the below information:
>
> 1.  A list of all stolen items being claimed in this loss
>
> 2.  A copy of your proof of ownership for all stolen items being claimed
>
> 3.  Do any of the stolen items have a lien holder?  If so, I will need their names, contract #'s and Telephone #'s.  If not, I will need something showing that your company owns all of the stolen property outright
>
> 4.  Any photos you might have of the stolen property
>
> 6.  A copy of the police report if you are able to obtain it
>
> 7.  Any internal reports with regards to this loss
>
> 8.  What steps have you taken to ensure a theft like this does not occur in the future?
>
> 9.  Any other information or documentation you might have with regards to this loss or items stolen

Ms. Beaudoin also attached a blank proof of loss form and "content inventory" worksheet.

2

The same day (November 7), Ms. Beaudoin mailed Plaintiff a letter requesting that the proof of loss be completed, dated, and signed.  She also requested that the proof of loss include an "itemized and detailed list of property claimed" and the "notarized signatures of all insureds."

D

One of Plaintiff's accountants, William Bolles, emailed Ms. Beaudoin photographs of the type of equipment that had been stolen on November 9.

E

On November 26, Ms. Beaudoin sent Plaintiff a reservation of rights letter.  The letter explains that Defendant "is still currently investigating the details and damages surrounding your theft loss" and concludes: "If you have any additional information that we have not considered to date and which you feel may be relevant to our coverage determination, please forward that information to me for consideration."

The letter does not, however, request any specific additional information.

F

On December 13, Plaintiff submitted to Defendant the sworn proof of loss form and dozens of pages of supporting exhibits.

1

The proof of loss was signed under oath by Plaintiff's chief financial officer, Fred Lambert.  (The three other named insureds, all of whom were defunct at the time, did not have someone sign the proof of loss on their behalf.)

Plaintiff identified, among other things: (1) who its owners, officers, members, and partners are; (2) when the loss occurred (the date, not the time); (3) where the loss occurred; (4)

what caused the loss; (5) who had custody of the property at the time it was lost; (6) when the police were notified; (7) which police department was notified; (8) who held title and interests in the property; (9) what specific property was lost; (10) what previous losses had been claimed under the policy; (11) what the total insurance was covering the property; (12) what the actual cash value of the lost property was; (13) what the whole loss amount claimed was; and (14) what the amount of the deductible was.

2

Attached to the sworn proof of loss form was a memorandum and spreadsheet. (The spreadsheet was not the "content inventory" form that Defendant had emailed Plaintiff.)  In the memorandum, Plaintiff summarizes the contents of the spreadsheet and the amount of the claimed loss, explaining:

> The attached list of stolen property is a complete list of what was stolen from Great Lakes Geophysical on October 31, 2012 to November 1, 2012.  This list includes 596 FDU boxes linked together, by cable, in groups of 4 (which represents 149 cables); 4 FDU boxes linked together in groups of 2 (which represents 2 cables); 8 LAUL units; 2 transverse cables.
>
> So far we have been able to identify when we purchased 376 FDU boxes linked together in groups of 4 (which represents 94 cables) and 4 LAUL units.  These items are part of assets #14 and #15 on the property schedule that is included in our policy.  We are also missing 2 transverse cables which we can take the value of asset #17 for this loss.
>
> At this time, we are submitting a partial loss request of $651,470.  This partial loss is calculated by taking the insured value of #14 which is $6,440 per link times 94 cables to equal $605,360.  Adding the amount of insured value of #15 which is $11,090 per unit times 4 units to equal $44,360 and #17 which is $875 times 2 which is $1,750.  The partial loss at this time equals $651,470.

The spreadsheet, in turn, details stolen items' serial numbers, values, and purchase dates.  The same day, Plaintiff submitted to Defendant receipts, invoices, financing agreements, and other supporting documentation.

G

1

About a month passed.  During this time, Plaintiff's CEO, Tony Ferguson, spoke with Defendant's agents.  He recalls: "I was interviewed by investigators from [Defendant] regarding the theft of seismic cables and related equipment.  I cooperated with these investigators.  I did not refuse to answer any of their questions, and I answered their questions truthfully."  Ferguson Aff. ¶ 3.

2

On January 18, 2013, other agents of Plaintiff and Defendant had several conversations. The substance of those conversations is disputed.

In the first conversation, Plaintiff's insurance agent, Tanya Curry (of The Holmes Organization), spoke with Defendant's claim department manager, Chiraq Mehta.  Ms. Curry supplies an affidavit asserting that Mr. Mehta "acknowledged that [Plaintiff] had complied with all ten of the required 'Duties in the Event of Loss' detailed in the policy," including "the duty to provide proof of loss."  Curry Aff. ¶ 4.  Mr. Mehta disputes this in his affidavit, asserting: "I did not tell Ms. Curry that [Plaintiff] had complied with all duties in the event of loss."  Mehta Aff. ¶ 11.

That same day, Jeff Holmes (also of The Holmes Organization) spoke with Ms. Beaudoin.  Mr. Holmes supplies an affidavit asserting that Ms. Beaudoin acknowledged that Plaintiff "had fully cooperated with [Defendant's] investigation and had complied with all ten of its 'Duties in the Event of Loss' under the policy."  Holmes Aff. ¶ 3.  Ms. Beaudoin disagrees with this in her affidavit, asserting: "I did not tell Mr. Holmes that [Plaintiff] had complied with all duties in the event of loss."  Beaudoin Aff. ¶ 11.

Mr. Holmes also spoke with Defendant's investigator, Rick Mank, that day. Mr. Holmes'
affidavit asserts that Mr. Mank "agreed that [Plaintiff] had fully cooperated with [Defendant's]
investigation and there was no need for additional information." Holmes Aff. ¶ 4. Mr. Mank's
affidavit disputes this, asserting: "I recall advising Mr. Holmes that my investigation was not
complete and as indicated additional investigation was being conducted." Monk Aff. ¶ 6.

H

On February 1, 2013, Defendant sent a letter to Plaintiff rejecting the proof of loss and
asking for further information. The letter explained: "We understand that the Proof of Loss was
signed by the Chief Financial Officer of [Plaintiff], and that this individual has the authority to
sign on behalf of [Plaintiff]. We note, however, that the individual has not typed their name onto
the document, so we are unsure of their identity." The letter continued:

> You have not provided us with a complete Proof of Loss permitting us to
> determine our liability, if any, under the policy, for the claimed loss and the
> amount of said loss. For the following reasons the Proof of Loss submitted may
> not be accurate or the information provided may be incomplete.
>
> •    The loss is claimed to have been discovered on November 3, 2012. The
>      Proof of Loss indicates that the loss occurred between October 31, 2012
>      and November 1, 2012, while on the police report it was reported to have
>      occurred between November 1, 2012 and November 3, 2012.
>
> •    The time of the loss is not reported.
>
> •    The stated cause of the loss is still under investigation.
>
> •    Who had custody of the property at the time of the loss is still under
>      investigation.
>
> •    The interest protected does not include those listed as Additional Insureds.
>
> •    The number of items of business personal property that were taken is still
>      being investigated.

> We note the "Total Insurance" may not be listed accurately. The Proof of Loss, likewise, does not provide adequate support for the amounts being claimed. . . .
>
> *This is not a denial of the claim.* The investigation of the claim continues under full Reservation of Rights as discussed in our letter of November 26, 2012. Please refer to your policy in its entirety for all terms, conditions, limitations, and exclusions.

The letter concluded by asking Plaintiff for 30 categories of information, as well as 19 categories of information from five third parties (Tony Ferguson, Debbie Ferguson, Bill Bolles, Kim Schwencke, and Thomas Langford).

The information sought from Plaintiff included four years' of state and federal tax returns, "[a]ll financial statements prepared from 2009 to the present," "[a]ll debt documents," three years of "credit card statements," and "all accounts receivable."

The information sought from the five third parties included four years' of state and federal tax returns, "[a]ll outstanding unpaid bills," "[d]etails of all assets owned," and "[c]ell phone and landline records for the months of October and November 2012, listing all calls received or placed, including any and all text messages."

I

On February 14, Plaintiff responded. Asserting that it had "fully complied with all conditions to coverage," Plaintiff demanded payment. Plaintiff also explained that although it remained "willing to comply with a reasonable document request, the document request contained in your February 1, 2013, letter is anything but that. Rather, it is evidence of bad faith."

Finally, Plaintiff observed that more than 60 days had passed since the sworn proof of loss was submitted, asserting "because more than sixty days has lapsed since the submission of

-10-

the proof of loss, [Defendant] must pay 12% interest on the amount of the claim. [Plaintiff] demands payment of the loss, plus interest, within seven days of this letter."

One week passed. Then another. Payment did not come. So this litigation did.

### J

Plaintiff filed suit against Defendant on February 28, 2013, and later filed an amended complaint. It has three counts. Count one seeks declaratory judgment on four issues. Plaintiff seeks a declaration that: (1) Plaintiff "has fully complied with all conditions to coverage"; (2) Plaintiff's proof of loss "constitutes 'satisfactory proof of loss' for the purposes of MCL 500.2006"; (3) Defendant's request for information on February 1 "is unreasonable and made in bad faith"; and (4) neither Plaintiff nor the five persons identified in the February 1 letter need to provide the information requested. Count two, a breach of contract claim, seeks $747,460 in damages. And count three seeks penalty interest pursuant to § 500.2006(4) of the Michigan Compiled Laws.

Defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment pursuant Rule 56. The motion includes 13 exhibits (seven more than Plaintiff's amended complaint). And Plaintiff's response includes 19 exhibits. The motion will therefore be treated as one for summary judgment.

Plaintiff, in turn, moves for partial summary judgment as well.

### II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III

"An insurance policy is much the same as any other contract." *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992) (citing *Eghotz v. Creech*, 113 N.W.2d 815 (Mich. 1962)).  Much the same — but not completely.  The most notable difference is that insurance policies are also unusually heavily regulated instruments.  *See generally* Tom Baker, *Insurance Law* 25 (2d ed. 2005) (noting that, among other things, "state statutes regulate the text and substantive content of insurance policies" and "prohibit unfair trade and claims settlement practices").

## A

One such example of this regulatory intervention is § 500.2006 of the Michigan Compiled Laws, which establishes statutory deadlines that insurers must comply with in processing "satisfactory" claims.

Here, the first issue raised by the parties' cross-motions is whether the proof of loss that Plaintiff submitted to Defendant was "satisfactory" as that term is used in § 500.2006.

## 1

In pertinent part, the statute provides that within 30 days of receiving a claim, the insurer must either settle the claim or specify what will "constitute a satisfactory proof of loss."  §

500.2006(3).  Then, within 60 days of receipt of the "satisfactory proof of loss," the insurer must

pay the claim.  *Id*.  Not doing so subjects the insurer to penalty interest on the claim of 12

percent.  § 500.2006(4).  Specifically, the statute provides:

> (1)   A person must pay on a timely basis to its insured . . . the benefits
> provided under the terms of its policy, or, in the alternative, the person
> must pay to its insured . . . 12% interest, as provided in subsection (4), on
> claims not paid on a timely basis. . . .

> (3)   An insurer shall specify in writing the materials that constitute a
> *satisfactory proof of loss* not later than 30 days after receipt of a claim
> unless the claim is settled within the 30 days.  If proof of loss is not
> supplied as to the entire claim, the amount supported by proof of loss shall
> be considered paid on a timely basis if paid within 60 days after receipt of
> proof of loss by the insurer.  Any part of the remainder of the claim that is
> later supported by proof of loss shall be considered paid on a timely basis
> if paid within 60 days after receipt of the proof of loss by the insurer. . . .

> (4)   If benefits are not paid on a timely basis the benefits paid shall bear simple
> interest from a date 60 days after *satisfactory proof of loss* was received
> by the insurer at the rate of 12% per annum, if the claimant is the insured
> or an individual or entity directly entitled to benefits under the insured's
> contract of insurance.

§ 500.2006(1), (3), (4) (emphasis supplied); *see generally* Richard Hugh McDermott, *Insurance

Code § 2006(4) Interest on Delinquently Paid Claims: Recognizing the § 2006(1) Optical

Illusion and Reconsidering the "Penalty" Label*, 79 Mich. B.J. 822 (2000) (discussing history of

§ 500.2006 and caselaw interpreting its provisions).

Here, as noted, on December 13, 2012 Plaintiff submitted a proof of loss.  The question is

whether it was "satisfactory."

## 2

The term "satisfactory" is not defined in the statute.  And, the Sixth Circuit

commiserates, under Michigan law "whether a proof of loss is 'satisfactory' is a long-standing

issue."  *ACME Roll Forming Co. v. Home Ins. Co.*, 31 F. App'x 866, 872 (6th Cir. 2002) (per

curiam) (applying Michigan law).   Nevertheless, the inquiry is guided by seven general principles.

First, the standard is reasonable — "the insurer cannot demand proof other than what is *reasonable and just*, and ordinarily such a provision will be considered complied with when there has been furnished such proof as establishes the fact of the loss and of the right of the claimant to recover."  *ACME Roll Forming Co.*, 31 F. App'x at 872 (emphasis in original) (quoting 13 Lee R. Russ et al., *Couch on Insurance* § 189:59 (3d ed.1999)).

Second, the standard is objective — the proof of loss must be "satisfactory to a neutral arbiter, rather than satisfactory to one of the two interested parties."  *ACME Roll Forming Co.*, 31 F. App'x at 872 (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 559 (6th Cir.1998) (en banc) (Boggs, J., dissenting)).

Third, the standard is purposive — whether the proof of loss is "satisfactory" depends on whether it has "fulfilled its three intended purposes: (1) allowing the insurer an opportunity to investigate the loss; (2) allowing the insurer to estimate its rights and liabilities; and (3) preventing fraud."  *Wineholt v. Cincinnati Ins. Co.*, 179 F. Supp. 2d 742, 752 (W.D. Mich. 2001); *see also Westfield Ins. Co. v. Appleton*, 132 F. App'x 567, 574 (6th Cir. 2005) (identifying same three policy objectives).

Fourth, "substantial performance" is sufficient — perfect performance is not required. *Gibson v. Grp. Ins. Co.*, 369 N.W.2d 484, 486 (Mich. Ct. App. 1985).  But, of course, more than "minimal effort" is required.  *Wineholt*, 179 F. Supp. 2d at 752. "The insured should make a reasonable effort to provide information reasonably within its possession and with a sufficient degree of particularity to allow the insurer to make an informed review of the claim."  *Id.*

-14-

Fifth, providing satisfactory proof of loss is a necessary milestone along the way to a valid claim, not the end of the road. *See Westfield*, 132 F. App'x at 574. The Sixth Circuit instructs: "An insured's provision of a proof of loss statement does not necessarily mark the end of an insurer's investigation; rather, it simply assists the insurer in identifying the nature of the loss and preventing fraud by forcing the insured to commit to a position within a reasonable time after a claimed loss." *Id*. Thus, conclusively establishing the loss is not required.

Sixth, "satisfactory proof of loss does not require agreement of the parties as to the amount of damages, but is rather the process of the insured providing the documents and evidence required by the insurer to begin processing the claim." *Yaldo v. Allstate Prop. & Cas. Ins. Co.*, 641 F. Supp. 2d 644, 650 (E.D. Mich. 2009) (Murphy, J.) (quoting *Griswold Props., LLC v. Lexington Ins. Co.*, 740 N.W.2d 659, 673 (Mich. Ct. App. 2007), *vacated in part on other grounds*, 276 551, 741 N.W.2d 549 (Mich. Ct. App. 2007)); *but see Whitney v. Allstate Ins. Co.*, 238 N.W.2d 410, 413 (Mich. Ct. App. 1975) ("The amount of the loss must be liquidated, known, or easily ascertained at the moment liability is denied for interest to be properly awarded.").

And seventh, "whether proof of loss was satisfactory is a question of fact." *Griswold Props.*, 740 N.W.2d at 677; *see also Reynolds v. Great Am. Ins. Co. of N.Y.*, 43 N.W.2d 901, 904 (Mich. 1950); *cf*. 14 John J. Dvorske, *Michigan Civil Jurisprudence* § 501 (West 2012) ("Whether an insurance claim is reasonably in dispute, for purposes of statutory penalty interest, is a question of fact."). Likewise, "whether an insured substantially complied with a proof-of-loss requirement is often a question of fact not to be decided on summary disposition." *Korn v. Paul Revere Life Ins. Co.*, 382 F. App'x 443, 448 (6th Cir. 2010) (per curiam); *see generally* Lee R. Russ et al., *Couch on Insurance* § 186:26 (3d ed. 1995) ("When disputed, the sufficiency of

proofs of loss is ordinarily a question of fact for the jury if there is evidence upon which to support a finding in favor of sufficiency.").

Here, it is this last principle that is dispositive.

3

a

As noted, Defendant emailed Plaintiff a blank "proof of loss" form on November 7, 2012. The only information requested on the form that Plaintiff did not provide was the precise time of day that the loss occurred, which Plaintiff did not know.   In contrast, the information that Plaintiff provided included: (1) who its owners, officers, members, and partners are; (2) when the loss occurred; (3) where the loss occurred; (4) what Plaintiff thinks caused the loss; (5) who had custody of the property at the time that it was lost; (6) when the police were notified of the loss; (7) which police department was notified; (8) who held title and interests in the property; (9) what specific property was lost; (10) what previous losses had been claimed under the policy; (11) what the total insurance was covering the property; (12) what the actual cash value of the lost property was; (13) what the whole loss amount claimed was; and (14) what the amount of the deductible was.

b

Defendant also attached a "content inventory" form to the November 7 email.  Plaintiff did not complete the content inventory form attached to the email, but gave Defendant a spreadsheet containing much (but not all) of the information.   The spreadsheet listed, for example, the items' serial numbers, insurance policy item number, price per unit, and purchase dates.  (It did not list the items' age.)

-16-

c

And finally, the body of Defendant's email requested eight specific categories of information:

- First, Defendant requested "[a] list of all stolen items being claimed in this loss," which Plaintiff provided (in the spreadsheet).

- Second, Defendant requested "[a] copy of your proof of ownership for all stolen items being claimed," which Plaintiff provided (attached to the spreadsheet).

- Third, Defendant requested the lien holder's "names, contract #'s and Telephone #'s," which Plaintiff provided (on the proof of loss form and the spreadsheet).

- Fourth, Defendant requested "[a]ny photos you might have of the stolen property," which Plaintiff provided in part (via email on November 9).

- Fifth, Defendant requested "[a] copy of the police report if you are able to obtain it." From the present record, it is not clear whether Plaintiff provided this to Defendant.

- Sixth, Defendant requested "[a]ny internal reports with regards to this loss." From the present record, it is not clear whether Plaintiff created any such reports or gave them to Defendant.

- Seventh, Defendant requested information about "steps [Plaintiff has] taken to ensure a theft like this does not occur in the future." From the present record, it is not clear whether Plaintiff took any such steps or furnished that information to Defendant.

- And eighth, Defendant requested "[a]ny other information or documentation you might have with regards to this loss or items stolen." As noted, Plaintiff furnished a list of the missing equipment, as well as documents detailing the purchase and financing of the missing equipment.

These responses, like Plaintiff's response to request for the "content inventory," were not perfect.

Whether they were "satisfactory" is a question of fact.

d

In addition to the information requested in the proof of loss form, contents inventory form, and the body of the November 7 email, Defendant also mailed Plaintiff a letter requesting an "itemized and detailed list of property claimed" and the "notarized signatures of all insureds."

Plaintiff, as noted, provided an itemized and detailed list.  Plaintiff also provided a notarized signature of its authorized representative.  But Plaintiff was unable to provide "notarized signatures of all insureds."  The reason appears simple — Plaintiff couldn't, as the other three named insureds were defunct.  *See generally Bd. of Councilmen of City of Frankfort v. Deposit Bank of Frankfort*, 120 F. 165, 166–67 (C.C.E.D. Ky. 1902) ("The dissolution of a corporation at common law not only means that the company has lost its franchise, and can no longer act in a corporate capacity, but it implies that the corporation has wholly ceased to exist in legal contemplation."), *aff'd,* 124 F. 18 (6th Cir. 1903).

As noted, "the insurer cannot demand proof other than what is *reasonable and just*." *ACME Roll Forming Co.*, 31 F. App'x at 872 (emphasis in original).  Demanding notarized signatures from defunct entities — entities that were not claiming any losses and who had, moreover, ceased to exist as a matter of law — would not be reasonable.

But it is possible that two of these entities, although defunct, maintained a corporate existence.  Specifically, Geostar Corp. and West Virginia Development, Inc. were Delaware corporations.  "The legal existence of all Delaware corporations, whether they expire by their own limitations or are otherwise dissolved, is continued for three years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct." *United States v. McDonald & Eide, Inc.*, 670 F. Supp. 1226, 1229-30 (D. Del. 1987) (quotation marks omitted) *aff'd*, 865 F.2d 73 (3d Cir. 1989).  Here, the record does not disclose when these

-18-

two entities were dissolved.  Thus, it is possible that they had a residual corporate existence at the time the proof of loss was submitted.

In sum, the proof of loss that Plaintiff submitted to Defendant was neither wholly deficient nor perfect.  And, as noted, "whether proof of loss was satisfactory is a question of fact."  *Griswold Props.*, 740 N.W.2d at 677; *see generally Couch on Insurance* § 186:26 ("When disputed, the sufficiency of proofs of loss is ordinarily a question of fact for the jury if there is evidence upon which to support a finding in favor of sufficiency.").

Neither party is entitled to summary judgment on this issue.

4

Against this conclusion, Defendant makes three arguments.

a

First, Defendant argues that the proof of loss was unsatisfactory because it lacked three of the named insured's signatures and because Plaintiff's signature is illegible.  In support of its argument, Defendant relies on *Barnes v. State Farm Fire & Casualty Co.*, 623 F. Supp. 538 (E.D. Mich. 1985) (Cohn, J.).  *Barnes*, however, will not bear the weight that Defendant places on it.

In *Barnes*, a husband and wife filed a joint insurance claim for losses incurred in a fire. *Id*. at 539.  They submitted a proof of loss form, but only the husband signed the form.  *Id*. at 540.  The insurer sought summary judgment against the wife.  *Id*. at 539.  Granting the motion, the court held that the wife's claim was precluded because she did not sign the form.  *Id*. at 539–40.  Rejecting the wife's contention that the husband's signature was sufficient because the purpose of the proof of loss is notice, the court explained:

> Notice is not the only purpose, however.  [Another] purpose of the proof of loss is to obtain a statement of the loss from the insured under oath such as will

-19-

> subsequently bind the insured and protect against the imposition of fraud. In this case, this latter purpose has not been served by [the husband's] filing by himself. The failure of [the wife] to sign for herself means that she is not bound by any statements as her own. Further, [the wife] is not bound by her husband's statements under oath. This could act to prejudice defendant at trial, since it could not impeach her with out-of-court testimony taken under oath. Thus, there is not substantial compliance.

*Id.* at 540 (quotation marks omitted). In passing, the court also emphasized that "[an] insured must make out the proof of loss herself or show good reason for not so doing." *Id.* at 541.

Here, unlike in *Barnes*, Plaintiff is the only insured who filed a claim. And Plaintiff is the entity which signed the claim. This is thus not a case where a non-signatory seeks to rely on another's signed proof of loss. Rather, it is a case where the signatory is the only party seeking to rely on the proof of loss. *Barnes* thus validates rather than vitiates the sufficiency of Plaintiff's proof of loss.

Defendant's ancillary argument that the signature is also unsatisfactory because it is illegible is similarly unpersuasive. On February 1, as noted, Defendant itself acknowledged that it knew who signed the proof of loss, writing: "We understand that the Proof of Loss was signed by the Chief Financial Officer of [Plaintiff], and that this individual has the authority to sign on behalf of [Plaintiff]." And that gentleman, Frederick Lambert, has produced an affidavit explaining: "In my capacity as CFO of [Plaintiff], I signed the proof of loss statement requested by [Defendant]. I did so under penalty of perjury." Lambert Aff. ¶ 3. Defendant's present argument, contradicted by its own statement, lacks merit.

### b

Defendant next asserts that the proof of loss is unsatisfactory because it did not "properly delineate the amounts claimed on the Proof of Loss." Def.'s Mot. 14. In support, Defendant quotes an unpublished memorandum opinion of the Michigan Court of Appeals, *Jajo v. Hartford*

*Casualty Insurance Co.*, No. 237955, 2002 WL 31940977 (Mich. Ct. App. Nov. 26, 2002).

Specifically, Defendant relies on the portion of the opinion that concluded that the insured had

not substantially complied, explaining: "The proof of loss form submitted by plaintiff contained

no information regarding the current value of the inventoried items or the amount of plaintiff's

claim for each item.  The information was necessary to allow defendant to evaluate the claim

where there was no other method of determining the amount of the claimed loss."  *Jajo*, 2002

WL 31940977, at *1.

      Here, as noted, Plaintiff's proof of loss form identified both the actual cash value of the

lost property and the whole loss amount claimed.  And while the proof of loss was not a model of

perfect performance (for reasons discussed above), a factfinder could conclude that it

substantially complied with the proof of loss requirement.  Defendant's reliance on *Jajo* is

misplaced.

c

      Finally, Defendant asserts that the proof of loss is unsatisfactory because "the insureds

have committed to nothing."  Def.'s Mot. 15.  Defendant elaborates:

> It was only this past month, two months after [Plaintiff] already filed suit, that
> [Defendant] learned the identity of one of its four named insureds' CFOs who
> actually signed the Proof of Loss.  The Proof of Loss only represented a partial
> loss request of $651,470 and [Plaintiff] was continuing to review data to finalize
> the additional items not yet included in this partial loss request.  However, even
> the actual signed Proof of loss form on its face, contained a figure different from
> the partial loss request. . .  [T]he record shows that the insureds possessed
> documents from which they could have at least prepared a good faith estimate of
> those figures, but failed to do so.

*Id.* (quotation marks, internal citations, and brackets omitted).

      Defendant's primary argument — that in the proof of loss form Plaintiff "committed to

nothing" — lacks merit for reasons detailed above.  To reiterate, the undisputed evidence is that

-21-

Plaintiff submitted a signed and notarized proof of loss. Plaintiff is bound by the assertions contained in that proof of loss. *Barnes*, 623 F. Supp. at 539–40 (discussed above).

Defendant's ancillary assertion that it did not know who signed the proof of loss is contradicted by its own statement of February 1. Rejecting the proof of loss on that date, Defendant wrote: "We understand that the Proof of Loss was signed by the Chief Financial Officer of [Plaintiff], and that this individual has the authority to sign on behalf of [Plaintiff]." (Plaintiff filed suit four weeks later.)

Defendant's assertion that the proof of loss was unsatisfactory because it sought only a partial loss request finds no support in the caselaw. Indeed, such an assertion is directly contradicted by the statute itself, which expressly provides that a partial proof of loss is acceptable:

> If proof of loss is not supplied as to the entire claim, the amount supported by proof of loss shall be considered paid on a timely basis if paid within 60 days after receipt of proof of loss by the insurer. Any part of the remainder of the claim that is later supported by proof of loss shall be considered paid on a timely basis if paid within 60 days after receipt of the proof of loss by the insurer.

Mich. Comp. Laws § 500.2006(3); *cf. Angott v. Chubb Grp. Ins.*, 717 N.W.2d 341, 354 (Mich. Ct. App. 2006) ("If there was a failure to supply a satisfactory proof of loss with regard to a portion of the claim, the court may still award penalty interest if there was a satisfactory proof of loss with respect to a separate portion of the claim.").

And finally, Defendant's assertion that Plaintiff possessed unidentified documents from which it "could have at least prepared a good faith estimate of those figures, but failed to do so," finds no support in the record. While Plaintiff's performance was not perfect, a factfinder could conclude that it was satisfactory. Defendant is not entitled to summary judgment on this issue.

5

Plaintiff, in turn, raises two principal arguments against the conclusion that it is not entitled to summary judgment on the question of whether the proof of loss was "satisfactory."

a

First, Plaintiff asserts that although its proof of loss was not perfect, it was substantially compliant. Plaintiff writes that it "provided every piece of obtainable information that [Defendant] had requested. The only requests that were not fulfilled concerned documents that did not exist or were not obtainable. Such a response is, unquestionably, substantially compliant."

As noted, however, the Sixth Circuit cautions that "whether an insured substantially complied with a proof-of-loss requirement is often a question of fact not to be decided on summary disposition." *Korn v. Paul Revere Life Ins. Co.*, 382 F. App'x 443, 448 (6th Cir. 2010) (per curiam).

The reason is straightforward — the standard is one of reasonableness, a fundamentally factual question. *See generally* 14 Lee R. Russ et al., *Couch on Insurance* § 205:15 (3d ed. 2009) ("Whether the reasonableness standard has been met is a question of fact."); *cf. Lowe v. Estate Motors Ltd.*, 410 N.W.2d 706, 713-14 (Mich. 1987) (discussing the negligence standard and noting that whether conduct is negligent is a question of fact because "the jury's judgment of what is reasonable under the circumstances of a particular case is more likely than the judicial judgment to represent the community's judgment of how reasonable persons would conduct themselves").

b

Next, Plaintiff asserts that it is entitled to summary judgment because "[Defendant's] representatives admitted to [Plaintiff] employees that [Plaintiff] had complied with all of [Plaintiff's] 'Duties in Event of a Loss' under the policy. . . . [Defendant] cannot escape its own admissions."

Plaintiff is correct that it has produced affidavits from its representatives asserting that Defendant made such admissions. *See, e.g.*, Curry Aff. ¶ 4; Holmes Aff. ¶¶ 3, 4 (quoted above). Defendant, however, has produced affidavits from its representatives disputing Plaintiff's assertions. Beaudoin Aff. ¶ 11; Mehta Aff. ¶ 11; Monk Aff. ¶ 6. In short, there is a genuine issue of material fact on this point — indeed, on this issue.

Neither party is entitled to judgment as a matter of law on whether the proof of loss was "satisfactory." (This is the only issue that Plaintiff seeks summary judgment on. Defendant moves for summary judgment on two other grounds, which are taken up in turn.)

B

Defendant next moves for summary judgment on count three, which seeks penalty interest pursuant to § 500.2006 of the Michigan Compiled Laws. Defendant writes: "Michigan law does not recognize the right of an insured to assert a separate claim for damages based on an alleged violation of the UTPA [Michigan's Uniform Trade Practices Act]."

Defendant is correct that "under Michigan law, an insured may not assert a separate claim for damages in addition to the penalty interest provided for by the UTPA." *Burns v. Unum Grp.*, 10-11957, 2010 WL 5173806, at *6 (E.D. Mich. Dec. 15, 2010) (citing *Young v. Mich. Mut. Ins. Co.*, 362 N.W.2d 844, 846 (Mich. Ct. App. 1984)).

-24-

Plaintiff's amended complaint, however, makes plain that count three is not asserting a separate claim for damages in addition the 12 percent penalty interest. *See* Am. Compl. ¶ 43 ("Plaintiff seeks 12% interest under the Uniform Trade Practices Act, Mich. Comp. Laws §500.2006; Plaintiff does not otherwise state a claim under the Uniform Trade Practices Act."). Count three simply seeks the penalty interest, full stop.

Defendant is not entitled to summary judgment on this issue.

## C

Finally, Defendant asserts that the case "should also be dismissed pursuant to Rule 56, because Plaintiff has engaged in an admitted pattern of non-cooperation and a deliberate effort to withhold material information by its failure to produce requested documents or submit to an EUO [examination under oath]." Def.'s Mot. 17. Specifically, Defendant asserts that Plaintiff's "unequivocal refusal" to cooperate is "evidenced by counsel's letter of February 14, 2013, the filing of this action, and GLG's counsel's letter of April 23, 2013." *Id*. at 18.

### 1

Defendant is correct that a finding of "wilful noncompliance" — an insured's deliberate "refusal to submit to an EUO or otherwise cooperate with an insurer in regard to contractual provisions allowing an insurer to investigate a claim" — results in the insured's case being dismissed. *Thomson v. State Farm Ins. Co.*, 232 38, 50, 592 N.W.2d 82, 87 (Mich. Ct. App. 1998). Defendant is not correct, however, that such a finding is appropriate in this case.

Defendant offers no evidence, for example, that it has requested Plaintiff submit to an examination under oath. (Indeed, Defendant implicitly concedes that it has never requested one. Def.'s Reply 2.) Plaintiff, moreover, offers ample evidence that Defendant has never requested such an examination. For example, the affidavit of Plaintiff's chief operating officer, Thomas

Lankford, provides: "At no time did [Defendant] request that I submit to an examination under oath.  If [Defendant] had made that request, I would have cooperated with it."  Lankford Aff. ¶ 3.  Likewise, the affidavit of Plaintiff's CEO, Tony Ferguson, provides: "At no time did [Defendant] ask me to provide a statement under oath.  If I had been asked, I would have provided it."  Ferguson Aff. ¶ 4.  And the affidavit of Plaintiff's staff accountant, William Bolles, provides: "At no time did [Defendant] ask me to provide a statement under oath.  To my knowledge, [Defendant] never requested anyone else at [Plaintiff's firm] to provide a statement under oath, either."  Bolles Aff. ¶ 7.

2

Similarly, Defendant expressly acknowledges that Plaintiff has agreed to produce all the information that Defendant asked for when it rejected Plaintiff's proof of loss "if [Defendant] agreed to the added condition of a protective order."  Def.'s Mot. 19; *see also* Pl.'s Resp. 15 ("Even though the documents that [Defendant] requested from [Plaintiff] . . . are extremely overbroad and have no bearing on the loss at issue, [Plaintiff] agreed to provide them.  [Plaintiff] wants a confidentiality agreement for these documents, because they contain confidential and proprietary information.").

Federal Rule of Civil Procedure Rule 26 provides: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c)(1)(G).  Wright and Miller observe that under this rule "the protection afforded is that if the information sought is shown to be relevant and necessary, proper

-26-

safeguards will attend disclosure." 8A Charles Alan Wright et al., *Federal Practice & Procedure* § 2043 (3d ed. 2010).

Whether or not to issue a protective order (and, if so, on what terms) is within the trial court's discretion. As Justice Oliver Wendell Holmes observed nearly a century ago: "It will be understood that if, in the opinion of the trial judge, it is or should become necessary to reveal the secrets to others, it will rest in the judge's discretion to determine whether, to whom, and under what precautions, the revelation should be made." E. *I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 103 (1917).

Here, the information that Defendant sought when it rejected Plaintiff's proof of loss included confidential commercial information. Among the 30 categories of information that Defendant sought from Plaintiff, Defendant demanded: (1) federal and state tax returns for the past four years; (2) "All financial statements prepared from 2009 to the present"; (3) "List of all accounts receivable"; (4) "All debt documents, including land contracts, promissory notes, and owner/shareholder loans"; (5) "Records showing or depicting all income from any source from 2009 to the present"; (6) "Copies of all physical inventories taken of business personal property from 2009 to the present"; and (7) "Records regarding the disposal, sale or gifting of any business personal property within the last three (3) years."

Plaintiff's agreeing to produce all of this information (along with the other 23 categories of requested information) provided that Defendant execute a confidentiality agreement does not demonstrate willful noncompliance. *See Blinco v. Preferred Mut. Ins. Co.*, 782 N.Y.S.2d 483, 485 (N.Y. App. Div. 2004) ("Plaintiffs' objection to the broad scope of documentation required by defendant was not unreasonable and, indeed, plaintiffs cross-moved in this action for a protective order with respect to that documentation in response to defendant's motion to dismiss

the action.  Thus, defendant did not establish the requisite willful noncooperation by plaintiff.");
*see also Miller v. Fluharty*, 500 S.E.2d 310, 315–16 (W. Va. 1997) (noting that the trial court
had issued a protective order directing the insurer to keep all medical information it received
from the insured confidential).

Defendant's argument that the case should be dismissed for willful noncompliance lacks
merit.

IV

Accordingly, it is **ORDERED** that Defendant's motion to dismiss or for summary
judgment (ECF No. 10) is **DENIED**.

It is further **ORDERED** that Plaintiff's motion for partial summary judgment (ECF No.
14) is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 25, 2013

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on July 25, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS